ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
STEPHEN J. ODDO (174828)
soddo@robbinsarroyo.com
EDWARD B. GERARD (248053)
egerard@robbinsarroyo.com
JUSTIN D. RIEGER (257321)
jrieger@robbinsarroyo.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

[Additional Counsel Appears on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANDREW NEWFIELD, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTIES |
| ARUBA NETWORKS, INC., DOMINIC P. ORR, KEERTI MELKOTE, BERNARD GUIDON, JUERGEN ROTTLER, DANIEL WARMENHOVEN, EMMANUEL T. HERNANDEZ, MICHAEL R. KOUREY, WILLEM P. ROELANDTS, HEWLETT-PACKARD COMPANY, and ASPEN ACQUISITION SUB, INC., | |
| Defendants. | |

Plaintiff, by his counsel, individually and on behalf of all others similarly situated, respectfully brings this class action for violations of the federal securities laws and breach of fiduciary duty against defendants named herein and alleges the following:

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought on behalf of the holders of Aruba Networks, Inc. ("Aruba" or the "Company") common stock against Aruba and its Board of Directors (the "Board"), for violation of the Securities Exchange Act of 1934 ("Exchange Act") and breaches of fiduciary duty and/or other violations of state law arising out of defendants' efforts to complete the sale of the Company to Hewlett-Packard Company ("HP") pursuant to an unfair process and for an unfair price (the "Proposed Acquisition"). This matter arises out of defendants' dissemination of a false and misleading proxy statement in violation of sections 14(a) and 20(a) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, and the Board members' breaches of their fiduciary duties owed to the Company's stockholders under state law.

2.      Aruba is a leading provider of next-generation network access solutions for the mobile enterprise. On March 2, 2015, Aruba and HP announced that they had entered into a definitive merger agreement (the "Merger Agreement") under which Aruba would be acquired by HP. Under the terms of the Merger Agreement, HP will acquire the Company in a cash and stock transaction in which the Company's stockholders would receive just $24.67 per share in cash for each Aruba common share outstanding.

3.      The Proposed Acquisition is the result of an unfair sales process designed to ensure that only HP has the opportunity to acquire Aruba. The Proposed Acquisition is being driven by the Company's Board and management, holders of an illiquid block of over 5.8 million Aruba shares, or 5.3% of the Company's outstanding stock. The Board and management sought out the Proposed Acquisition in order to secure increased liquidity for their illiquid holdings in the Company, and if the deal closes they will receive *over $144 million* for their illiquid Aruba shares. Moreover, the Company's Board is dominated by insiders and former HP executives.

- 1 -

4. The Proposed Acquisition price of $24.67 per share significantly undervalues Aruba. Before the deal was announced, at least ten market analysts had set a target price for Aruba common stock above the offer price of $24.67. At least one Wall Street analyst has a $34 price target on Aruba stock, and the $24.67 per share offering price is significantly below the target price of $28 set by an analyst at Cowen and Company on August 27, 2014, and $27 set by analysts at Northland Securities, Inc. and Dougherty & Company LLP on April 3 and August 27, 2014, respectively.

5. The Merger Agreement also includes deal protection devices that will preclude a fair sales process for the Company and lock out competing bidders. These preclusive deal protection devices include:

(a) a "no-solicitation" provision that precludes Aruba from providing confidential Company information to, or even communicating with, potential competing bidders for the Company except under very limited circumstances;

(b) an illusory "fiduciary out" for the no-solicitation provision that requires the Company to provide HP with advance notice before providing any competing bidder with any confidential Company information, even after the Board has determined that the competing bid is reasonably likely to lead to a superior proposal and that the Board is breaching its fiduciary duties by not providing the competing bidder with confidential Company information;

(c) an "information rights" provision that requires the Company to provide HP with confidential, non-public information about competing proposals that HP can then use to formulate a matching bid;

(d) a "matching rights" provision that requires Aruba to provide HP with the opportunity to match any competing proposal; and

(e) a "termination fee" provision that requires Aruba to pay HP $90 million if the Proposed Acquisition is terminated in favor of a superior proposal.

6. To make matters worse, and in an attempt to secure shareholder support for the unfair Proposed Acquisition, on March 17, 2015, defendants filed with the SEC a materially false and misleading Preliminary Proxy Statement on Schedule 14A (the "Proxy"). The Proxy, which recommends that Aruba shareholders vote in favor of the Proposed Acquisition, omits and/or

- 2 -

misrepresents material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company on a stand-alone basis and as a merger partner for HP. Specifically, the Proxy omits and/or misrepresents the material information detailed *infra* in ¶¶50-63, in contravention of sections 14(a) and 20(a) of the Exchange Act and/or defendants' fiduciary duty of disclosure under state law.

7. In sum, by agreeing to the Proposed Acquisition, each of the defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith, and fair dealing, and/or has aided and abetted such breaches. Rather than acting in the best interests of the Company's shareholders, defendants spent substantial effort tailoring the structural terms of the Proposed Acquisition to aggrandize their own personal interests and to meet the specific needs of HP, which efforts will eliminate the equity interest of Aruba's public shareholders.

8. In essence, the Proposed Acquisition is the product of a hopelessly flawed process that was designed to ensure the merger of Aruba with HP on terms preferential to HP and defendants, and detrimental to plaintiff and Aruba's shareholders. Plaintiff seeks to enjoin the Proposed Acquisition.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to section 27 of the Exchange Act. The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware, defendant Aruba's state of incorporation, and thus may be maintained in federal court. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

10. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Aruba's headquarters are located at 1344 Crossman Avenue, Sunnyvale, California, and defendants include directors who reside in California.

### INTRADISTRICT ASSIGNMENT

12.     This action is properly assigned to the San Jose division of this Court.

### PARTIES

13.     Plaintiff Andrew Newfield, as set forth in the accompanying certification, is, and at all times relevant hereto was, a shareholder of Aruba.

14.     Defendant Aruba is a Delaware corporation headquartered in Sunnyvale, California.

15.     Defendant Dominic P. Orr ("Orr") is, and at all times relevant hereto has been, Aruba's President, Chief Executive Officer ("CEO"), and Chairman of the Board.

16.     Defendant Keerti Melkote ("Melkote") is Aruba's co-founder and, at all times relevant hereto has been, Aruba's Chief Technology Officer and a member of the Board.

17.     Defendant Bernard Guidon ("Guidon") is, and at all times relevant hereto has been, a member of the Board. Defendant Guidon spent twenty-five years working with HP, most recently serving as Vice President and General Manager of the HP Professional Services Organization from 1999 until 2002.

18.     Defendant Juergen Rottler ("Rottler") is, and at all times relevant hereto has been, a member of the Board. Defendant Rottler held several global leadership positions at HP, where he worked in its hardware, software, and services businesses between 1986 and 2004.

19.     Defendant Daniel Warmenhoven ("Warmenhoven") is, and at all times relevant hereto has been, a member of the Board. Defendant Warmenhoven held executive and managerial positions at HP from 1985 to 1989.

20.     Defendant Emmanuel T. Hernandez is, and at all times relevant hereto has been, a member of the Board.

21.     Defendant Michael R. Kourey is, and at all times relevant hereto has been, a member of the Board.

- 4 -

22.     Defendant Willem P. Roelandts ("Roelandts") is, and at all times relevant hereto has been, a member of the Board. Defendant Roelandts held various positions during a twenty-nine-year career at HP, where he last served as Senior Vice President and General Manager of Computer Systems Organizations.

23.     Defendant HP is a Delaware corporation with principal executive offices located at 3000 Hanover Street, Palo Alto, California. Defendant HP provides information technology products, technologies, software, solutions, and services to individual consumers, small- and medium-sized businesses, and larger enterprises throughout the world. As of October 31, 2014, defendant HP had approximately 302,000 employees worldwide.

24.     Defendant Aspen Acquisition Sub, Inc. ("Merger Sub") is a wholly-owned subsidiary of defendant HP. Upon completion of the Proposed Acquisition, defendant Merger Sub will merge with and into defendant Aruba and cease its separate corporate existence.

25.     The defendants named above in ¶¶15-22 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of all public holders of Aruba common stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

27.     This action is properly maintainable as a class action under Rule 23.

28.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of March 12, 2015, there were more than 108 million shares of Aruba common stock outstanding.

29.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

(a)     whether defendants have violated sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by disseminating a materially false and misleading Proxy to Aruba shareholders;

(b)     whether defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition, and/or are aiding and abetting therein;

(c)     whether defendants are engaging in self-dealing in connection with the Proposed Acquisition, and/or are aiding and abetting therein;

(d)     whether defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition, and/or are aiding and abetting therein;

(e)     whether defendants are unjustly enriching themselves and other insiders or affiliates of Aruba and/or HP and Merger Sub, and/or are aiding and abetting therein;

(f)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, candor, and fair dealing, and/or are aiding and abetting therein;

(g)     whether defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets, and/or have aided and abetted therein;

(h)     whether the Proposed Acquisition compensation payable to plaintiff and the Class is unfair and inadequate; and

(i)     whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

30.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

31.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly, and adequately protect the interests of the Class.

32.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

33.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

34.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### THE PROPOSED ACQUISITION

35.     Aruba is a leading provider of next-generation network access solutions for the mobile enterprise. Aruba designs and delivers Mobility-Defined Networks that empower information technology (IT) departments and #GenMobile, a new generation of tech-savvy users who rely on their mobile devices for every aspect of work and personal communication. To create a mobility experience that #GenMobile and IT can rely upon, Aruba Mobility-Defined Networks™ automate infrastructure-wide performance optimization and trigger security actions that used to require manual IT intervention. The results are dramatically improved productivity and lower operational costs. Listed on the NASDAQ Stock Market and Russell 2000® Index, Aruba is based in Sunnyvale, California, and has operations throughout the Americas, Europe, Middle East, Africa, and Asia Pacific regions.

36.     HP is a leading global provider of products, technologies, software, solutions, and services to individual consumers, small- and medium-sized businesses and large enterprises, including customers in the government, health, and education sectors.

37.     On March 2, 2015, Aruba and HP announced that they had entered into the "Merger Agreement under which Aruba would be acquired by HP. Under the terms of the Merger Agreement, HP will acquire the Company in a cash and stock transaction in which the Company's stockholders would receive just $24.67 per share in cash for each Aruba common share outstanding.

- 7 -

38.     The press release announcing the Proposed Acquisition states, in pertinent part:

**HP to Acquire Aruba Networks to Create an Industry Leader in Enterprise Mobility**

*Deal combines Aruba Networks' leadership in wireless mobility solutions with HP's strength in wired switching*

*Positions HP to accelerate enterprise transition to converged campus network*

...HP and Aruba Networks today announced a definitive agreement for HP to acquire Aruba, a leading provider of next-generation network access solutions for the mobile enterprise, for $24.67 per share in cash. The equity value of the transaction is approximately $3.0 billion, and net of cash and debt approximately $2.7 billion. Both companies' boards of directors have approved the deal.

Aruba is a Sunnyvale-based industry leader in wireless networking with approximately 1,800 employees. The company had revenues of $729 million in fiscal 2014, and has reported compound annual revenue growth of 30 percent over the last five years.

Aruba boasts a highly regarded innovation engine and specialized sales, marketing and channel model, complementing HP's leading networking business and go-to-market breadth. Together, HP and Aruba will deliver next-generation converged campus solutions, leveraging the strong Aruba brand. This new combined organization will be led by Aruba's Chief Executive Officer Dominic Orr, and Chief Strategy and Technology Officer, Keerti Melkote, reporting to Antonio Neri, leader of HP Enterprise Group. With this move, HP will be uniquely positioned to deliver both the innovation and global delivery and services offerings to meet customer needs worldwide.

With the shift to mobile, enterprise networking needs are exceeding the capabilities of legacy infrastructure. At the same time, organizations are shifting rapidly to mobility-centric workplaces for their employees, guests, customers and students. The next-generation 802.11ac Wi-Fi standard is critical in enabling this trend. This new technology will support the faster speeds and access to cloud applications that end-users expect. Enterprises need comprehensive, integrated and secure networking solutions to help them transition legacy systems to the wireless edge. Today's announcement directly addresses these market trends.

"Enterprises are facing a mobile-first world and are looking for solutions that help them transition legacy investments to the new style of IT," said Meg Whitman, Chairman, President and Chief Executive Officer of HP. "By combining Aruba's world-class wireless mobility solutions with HP's leading switching portfolio, HP will offer the simplest, most secure networking solutions to help enterprises easily deploy next-generation mobile networks."

"Together with HP, we have a tremendous opportunity to become an even greater force in enterprise mobility and networking," said Mr. Orr. "This transaction brings

- 8 -

together Aruba's best-of-breed mobility hardware and software solutions with HP's leading switching portfolio. In addition, Aruba's channel partners will have the opportunity to expand their businesses with HP offerings. Together, we will build on Aruba's proven 'customer first, customer last' culture, creating an innovative, agile networking leader ideally positioned to solve our customers' most pressing mobility, security and networking challenges."

HP and Aruba believe that by combining complementary product portfolios and go-to-market approaches they will be able to accelerate revenue growth and strengthen the financial performance of the combined HP Networking business, and create a leading competitor in the $18 billion and growing campus networking sector. Overall, HP expects the acquisition to be accretive to earnings in the first full year following close.

The transaction is expected to close in the second half of HP's fiscal year 2015, subject to Aruba stockholder approval, regulatory approvals in the US and other countries as well as other customary closing conditions.

39. The Proposed Acquisition is the result of an unfair sales process designed to ensure that only HP has the opportunity to acquire Aruba. The Proposed Acquisition is being driven by the Company's Board and management, holders of an illiquid block of over 5.8 million Aruba shares, or 5.3% of the Company's outstanding stock. The Board and management sought out the Proposed Acquisition in order to secure increased liquidity for their illiquid holdings in the Company, and if the deal closes they will receive *over $144 million* for their illiquid Aruba shares. Moreover, the Company's Board is dominated by insiders and former HP executives. Defendants Orr and Melkote are also Aruba executives, and defendants Guidon, Rottler, Warmenhoven, and Roelandts are former HP executives.

40. From the Proposed Acquisition, Aruba's officers and directors will receive millions of dollars in special payments – not being made to ordinary shareholders – for currently unvested stock options, performance units, and restricted shares, all of *which shall, upon completion of the transaction, become fully vested and exercisable*. The Company's senior management is also entitled to receive from the Proposed Acquisition millions of dollars more in change-of-control payments.

41. Furthermore, the Board selected not one but two financial advisors that are also conflicted. Qatalyst Partners LP ("Qatalyst") will receive a $24.9 million contingent success

- 9 -

fee, and Evercore Group L.L.C. ("Evercore") will receive $7.4 million contingent success fee, but only if the Proposed Acquisition closes.

42.     As a result of these unaddressed and unresolved conflicts, the process leading to the Proposed Acquisition was fundamentally flawed, for the following reasons, among others:

(a)     during the process, the Board did not contact any private equity firms;

(b)     despite determining on November 25, 2014, due to HP's foot dragging and the absence of any offer from HP, to suspend negotiations with HP, the Board returned to the table on January 21, 2015, even though HP had still not made an offer to acquire Aruba;

(c)     after receiving in late January 2015 HP's initial offer to acquire Aruba for $23.25 in cash per Aruba share, the Board determined on February 4, 2015, that HP should pay $29 a share, but less than a week later concluded that $24.67 per Aruba share was a "*compelling offer*"; and

(d)     despite considering the potential upside inherent in successfully executing on the Company's "Aruba 2.0" strategy, which management had proposed to the Board as its going-forward strategy as a stand-alone company, which consisted of *continuing 20%-25% year-over-year growth*, the Board, on March 1, 2015, decided to sell the Company to HP for $24.67 per share, almost 15% less than the $29 per share the Board sought for Aruba less than four weeks earlier.

43.     The Proposed Acquisition significantly undervalues Aruba.  Before the Proposed Acquisition was announced, at least ten market analysts had set a target price for Aruba common stock above the offer price of $24.67.  At least one Wall Street analyst has a $34 price target on Aruba stock, and the $24.67 merger consideration is significantly below the target price of $28 set by an analyst at Cowen and Company on August 27, 2014, and $27 set by analysts at Northland Securities, Inc. and Dougherty & Company LLP on April 3 and August 27, 2014, respectively.

44.     Moreover, just last month, on February 26, 2015, Aruba reported strong earnings results for its second quarter of 2015.  Revenues for the second quarter fiscal 2015 were $212.9 million compared with $176.4 million for the comparable quarter in fiscal 2014, representing 21% year-over-year growth.  Additionally, Aruba beat analyst consensus estimates for both adjusted net

income and adjusted earnings per share in three out of its last four quarters and beat analyst consensus estimates for sales in each of its last four quarters.

45.     Commenting on these results, Aruba President and CEO, defendant Orr, stated:

We are pleased to report solid results for the second quarter, reflecting continued execution on our strategic plan…. Our results were supported by continued growth in our key geographies, strong year-over-year performance in our Federal vertical, further success in penetrating the Global 2000, and increasing traction in our SME business. We believe we are well positioned to capitalize on the continued growth in WLAN, the potential opportunities from increased E-Rate funding later this year, and the continued 802.11ac refresh cycle.

Aruba Chief Financial Officer Michael Galvin added: "'We delivered a strong financial quarter on many fronts. Strong revenue growth and gross margin expansion coupled with prudent management of operating expenses led to a record quarter for non-[generally accepted accounting principles ("GAAP")] operating margin.'"

46.     Separately, *TheStreet's* Ratings team has this to say about Aruba: "The company's strengths can be seen in multiple areas, such as its robust revenue growth, largely solid financial position with reasonable debt levels by most measures and impressive record of earnings per share growth."

47.     The Proposed Acquisition consideration also fails to reflect Aruba's value to HP. Aruba's annual sales are projected to grow to more than $1 billion by fiscal 2017, an average of eight analysts' estimates compiled by *Bloomberg* shows. As a result, HP expects the acquisition to be accretive to earnings in the first full year following the transaction's close, which is expected to be in the second half of HP's fiscal year 2015. Aruba would bolster HP's networking business, which had sales of $562 million in the quarter that ended in January, an 11% decline from a year earlier. Aruba posted total sales of $207.8 million for the quarter that closed October 31, representing growth of 29%. And as JP Morgan analyst Rod Hall observed about the Proposed Acquisition: "'As speculated last week, HP announced a definitive agreement to acquire Aruba Networks for $3.0bn. We consider the deal to be a good move for HP as it positions it better in the WLAN market in the fight against Cisco.'" Moreover, Aruba has proprietary technology that adds value to HP at a time when

- 11 -

1  investors are worried about the company's non-proprietary technology in the personal computer

2  (PC) industry.

3       48.     As part of the Proposed Acquisition, defendants agreed to several provisions designed

4  to keep out competitive bidders that may have offered more value to the Company's shareholders.

5  Concurrently with the execution of the Merger Agreement, defendant Orr, President and CEO of the

6  Company, and defendant Keerti Melkote, Chief Technology Officer of the Company, who own in

7  the aggregate over 5.26 million shares of Company common stock, entered into a voting agreement

8  with HP (the "Voting Agreement") pursuant to which each of them agreed to vote all the shares of

9  Aruba common stock they beneficially owned in favor of the adoption of the Merger Agreement,

10  and against any alternative acquisition proposal and against any action or agreement that would

11  delay, prevent, impede, or impair the ability of HP to complete the merger and acquire Aruba.

12       49.     In addition to the Voting Agreement, the Merger Agreement also includes deal

13  protection devices that will preclude a fair sales process for the Company and lock out competing

14  bidders. These preclusive deal protection devices include:

15          (a)     a "no-solicitation" provision that precludes Aruba from providing confidential

16  Company information to, or even communicating with, potential competing bidders for the

17  Company except under very limited circumstances;

18          (b)     an illusory "fiduciary out" for the no-solicitation provision that requires the

19  Company to provide HP with advance notice before providing any competing bidder with any

20  confidential Company information, even after the Board has determined that the competing bid is

21  reasonably likely to lead to a superior proposal and that the Board is breaching its fiduciary duties

22  by not providing the competing bidder with confidential Company information;

23          (c)     an "information rights" provision that requires the Company to provide HP

24  with confidential, non-public information about competing proposals which HP can then use to

25  formulate a matching bid;

26          (d)     a "matching rights" provision that requires Aruba to provide HP with the

27  opportunity to match any competing proposal; and

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
AND BREACH OF FIDUCIARY DUTIES

1         (e)    a "termination fee" provision that requires Aruba to pay HP $90 million if the

2 Proposed Acquisition is terminated in favor of a superior proposal.

3       50.    In an attempt to secure shareholder support for the unfair Proposed Acquisition, on

4 March 17, 2015, defendants issued the materially false and misleading Proxy.  The Proxy, which

5 recommends that Aruba shareholders vote in favor of the Proposed Acquisition, omits and/or

6 misrepresents material information about the unfair sales process for the Company, conflicts of

7 interest that corrupted the sales process, the unfair consideration offered in the Proposed Acquisition,

8 and the actual intrinsic value of the Company on a stand-alone basis and as a merger partner for

9 Aruba.  Specifically, the Proxy omits and/or misrepresents the material information set forth below,

10 in contravention of sections 14(a) and 20(a) of the Exchange Act and/or defendants' fiduciary duty of

11 disclosure under state law.

12 ***Disclosure Deficiencies Concerning the Conflicted Sales Process***

13       51.    With respect to the sales process that led to the Proposed Acquisition, the Background

14 of the Merger section contained on pages 38-45 of the Proxy is materially deficient in that it fails to

15 disclose:

16         (a)    the particular background financial information regarding the Company and

17 next steps that Qatalyst discussed with the Board on September 10, 2014 (Proxy at 38);

18         (b)    the amount of synergies HP anticipated it would achieve as a result of

19 acquiring the Company as of October 5, 2014 and October 16, 2014 (Proxy at 40);

20         (c)    the financial items Aruba management discussed with HP during their series

21 of calls from October 8, 2014 through October 13, 2014 (Proxy at 40);

22         (d)    the rationale for engaging in discussions concerning the retention of an

23 additional financial advisor on or around January 21, 2015 (Proxy at 41);

24         (e)    the basis for not reaching out to any of Parties 1-5 after reopening discussions

25 concerning a potential sale of the Company on or around January 21, 2015 (Proxy at 42);

26         (f)    the particular financial aspects of HP's proposal that Qatalyst representatives

27 discussed with the Board on January 31, 2015 (Proxy at 41-42);

28

(g)      the basis for making a counter-proposal to HP of $29 per share in cash on or around February 4, 2015 (Proxy at 42);

(h)      the factors that led the Board to its February 10, 2015 determination, that $24.67 per share in cash was a compelling offer for Aruba (Proxy at 43);

(i)      the particular financial aspects of HP's proposal that Qatalyst representatives discussed with the Board on February 27, 2015 (Proxy at 44); and

(j)      the factors that led the Board to determine on February 27, 2015, that its conclusion about the favorability of the $24.67 per share price relative to the fundamental metrics of Aruba had not changed (Proxy at 44).

52.      The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)      from pages 38-39 of the Proxy:

On September 10, 2014, at a regular meeting of the Board of Directors with representatives of both Qatalyst Partners and Wilson Sonsini Goodrich and Rosati, which we refer to as "WSGR", in attendance, Mr. Orr described his recent conversations with HP regarding the potential strategic transaction. Mr. Orr noted that HP had expressed interest in expanding its networking business and that Mr. Neri indicated that an acquisition of Aruba would provide HP with a platform for future growth and development in that sector. Mr. Orr also noted that representatives of HP had indicated that they were evaluating several targets for a potential strategic acquisition and that these potential targets would be discussed with HP's board of directors in late September. Representatives of Qatalyst Partners then discussed with the Board of Directors background financial information regarding the Company and next steps that could be undertaken in preparation for evaluating any specific acquisition proposals that the Company might receive. Representatives of Qatalyst Partners led a preliminary discussion of third parties that might reasonably have the interest and capability to consider a transaction with Aruba. Following questions and discussion by the Board of Directors, including potential responses to HP, the Board of Directors directed Mr. Orr to inform HP that the Board of Directors had made no determination to sell Aruba, but that the Board of Directors was amenable to further dialogue regarding a potential strategic transaction. After this meeting, senior executives of Aruba and HP spoke regarding potential next steps.

(b)      from page 40 of the Proxy:

On October 5, 2014, Mr. Neri contacted Mr. Orr and informed him that the October 2 meetings had increased HP's interest in the potential transaction and that the product roadmap presented by Mr. Melkote indicated greater synergies than HP's prior

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
AND BREACH OF FIDUCIARY DUTIES

assessment. Mr. Neri also told Mr. Orr that he was keeping Ms. Whitman apprised of the parties' progress.

\* \* \*

On October 16, 2014, at the request of Mr. Orr, who desired to better understand HP's go-to-market strategy and to discuss potential synergies, Messrs Orr and Murphy, Ms. Hahn, Joakim Johansson, the Vice President of Corporate Development at HP, Monique Nolk, the Vice President of Strategy and Operations at HP Networking and Matt Greenly, the CFO & Vice President, HP Servers and Networking, met to further discuss the potential strategic transaction. Parties in attendance at the meeting also discussed the follow-up diligence requests previously provided by HP.

(c)     from pages 41-42 of the Proxy:

On November 24, 2014, Mr. Neri informed Mr. Orr that HP's board had indicated that they wanted HP's management to prepare additional financial analyses regarding the proposed Aruba transaction and that HP would require an additional two to three weeks to address the HP board's questions. Mr. Orr informed Mr. Warmenhoven of HP's request and, after internal discussion, Aruba determined that it would suspend discussions with HP.

\* \* \*

On January 21, 2015, as a follow up to the late December invitation, Messrs. Orr and Neri had a dinner meeting with Ms. Whitman at which the parties reopened discussions regarding a strategic transaction and the strategic potentials of an HP acquisition of Aruba.

\* \* \*

Later on January 31, 2015, at a special meeting of the Board of Directors attended by representatives of WSGR and Qatalyst Partners, respectively, the Board of Directors discussed the non-binding letter of intent from HP. Mr. Orr provided a summary of his telephone calls with representative of HP regarding the letter of intent. Representatives of Qatalyst Partners discussed with the Board of Directors financial aspects of the proposal. Representatives of WSGR discussed with the Board of Directors legal aspects of the proposal. Following the departure of the representatives of Qatalyst Partners from the meeting, the Board of Directors resolved to engage Evercore to act as an additional financial advisor to Aruba.

\* \* \*

On February 4, 2015, at a special meeting of the Board of Directors attended by representatives of WSGR, Evercore and Qatalyst Partners, the Board of Directors reviewed HP's January 31 proposal. WSGR reviewed the Board of Directors' fiduciary duties in connection with its receipt of the proposal from HP. Representatives of Qatalyst Partners and Evercore each discussed with the Board of

- 15 -

Directors financial aspects of the HP proposal. The Board of Directors discussed the proposal with a focus on how the proposal compared to Aruba's standalone financial plan in terms of maximizing stockholder value. Representatives of Qatalyst and Evercore, respectively, then discussed with the Board of Directors the manner in which to respond to HP with respect to its proposal. Following such discussions, the Board of Directors authorized representatives of Evercore to present a counter-proposal to HP of $29.00 per share in cash.

(d)    from page 43 of the Proxy:

On February 10, 2015, the Board of Directors convened a special meeting to discuss the letter of intent. Representatives of Evercore described the negotiations with Barclays over the past few days. The Board of Directors discussed the solicitation process undertaken by its financial advisors, in which six of the strategic acquirors that presented the strongest strategic fit with Aruba had all declined to explore an acquisition transaction. The Board of Directors also discussed the recent weakness in the Aruba share price. The Board of Directors discussed the potential upside inherent in successfully executing on the "Aruba 2.0" strategy which management had proposed to the Board of Directors as its going-forward strategy as a stand-alone company, together with the risks inherent in executing on such a strategy. The "Aruba 2.0" strategy, which contemplated both a continued emphasis on growing core areas and a transformative shift in product focus, consisted of continuing 20-25% year-over-year growth, focusing on premium WLAN for enterprise customers, maintaining strong margins for Aruba's WLAN platform, integrating go-to-market teams and executing on cloud architecture in conjunction with a move to software subscriptions to capture recurring revenue. The Board of Directors then discussed whether to make a counter-offer to HP again at the $25.00 per share price in light of the fact that HP had characterized its proposal as its "best and final" offer. After discussion, the Board of Directors concluded that $24.67 per share in cash was a compelling offer for Aruba and authorized its management to enter into an exclusivity agreement with HP and commence negotiations on that basis.

(e)    from page 44 of the Proxy:

Recognizing that, consistent with the unusual rise in stock price and trading volume in the days following the Bloomberg report, on February 27, 2015, Aruba's stock had been trading above the negotiated deal price and that the trading price of Aruba's stock at the close of market was $24.81, the Board of Directors held a special meeting to determine whether to proceed with the proposed strategic transaction. At the meeting, representatives of Qatalyst Partners discussed with the Board of Directors the financial aspects of the HP proposal and the Company's earnings release and recent trading information regarding the Company and other companies in its industry in the immediate aftermath of their respective earnings announcements. The Board of Directors further discussed whether the positive earnings results altered its perception of the fundamentals of Aruba's business. After discussion, the Board of Directors determined that its conclusion about the favorability of the $24.67 per share price relative to the fundamental financial metrics of Aruba had not changed. The Board of Directors then debated whether to

- 16 -

insist on an upward adjustment to the purchase price to $25.00 per share in light of the higher market price. After discussion, it was decided that because the higher trading price was primarily being driven by market speculation of a transaction, and not by changes in the fundamentals of the business, HP would be unlikely to raise the transaction pricing in light of such market movements. The Board of Directors believed that, given the low likelihood of obtaining a higher per share price, Aruba should focus on obtaining a lower termination fee and increased commitment from HP on efforts to seek regulatory approvals. Following the Board of Directors' decision to proceed with the proposed transaction, representatives of WSGR and Gibson Dunn had several discussions during the period from February 28, 2015 to March 1, 2015 to finalize the remaining open terms of the Merger Agreement, disclosure schedules and voting agreement. The last two remaining issues in the Merger Agreement, which were heavily negotiated among the parties before agreement, were the size of the termination fee and covenants related to efforts to consummate the transaction.

53.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶51 because they give shareholders a materially incomplete and distorted picture of the sales process underlying the Proposed Acquisition, the various alternatives available to (and considered by) defendants other than the Proposed Acquisition, and the efforts taken (or not taken) to ensure that no conflicts of interest tainted the negotiation process, thus rendering it unfair to plaintiff and the other members of the Class. Without this omitted information, Aruba shareholders cannot make a fully-informed decision whether to vote to approve the Proposed Acquisition.

### ***Disclosure Deficiencies Concerning the Valuation Analyses Prepared by Qatalyst***

54.     The Proxy cites to and annexes the opinion of Aruba's financial advisor Qatalyst, which concludes that the consideration to be received by the holders of Aruba common stock in the Proposed Acquisition is fair, from a financial point of view, to such holders. However, the Proxy fails to disclose material information about Qatalyst's opinion and methodology, rendering it impossible for Company stockholders to effectively evaluate, and determine how to vote with respect to, the Proposed Acquisition.

55.     The description of Qatalyst's *Illustrative Discounted Cash Flow Analysis* on page 50 of the Proxy is materially deficient because it fails to disclose:

(a)     the individual inputs and assumptions utilized by Qatalyst to derive the selected discount rate range of 10.5%-14%;

- 17 -

(b)     Qatalyst's basis for the specific selection of a 28% dilution factor as used in the analysis;

(c)     Qatalyst's basis for the selection of 11.0x – 16.0x next twelve months net operating profit after taxes ("NOPAT") multiples, given that it did not observe NOPAT multiples within its Illustrative Selected Companies or Illustrative Selected Transactions Analyses; and

(d)     the implied perpetuity growth rate range resulting from this analysis.

56.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 50 of the Proxy:

**Illustrative Discounted Cash Flow Analysis**

Qatalyst Partners performed an illustrative discounted cash flow analysis, which is designed to imply a potential, present value of share values for Aruba's common stock as of January 31, 2015 by:

- adding:

    (a)     the implied net present value of the estimated future unlevered free cash flows of Aruba, based on the Management Projections, for the third and fourth quarters of fiscal year 2015, ending July 31, 2015, through fiscal year 2019, ending July 31, 2019 (which implied present value was calculated by using a range of discount rates of 10.5% to 14.0%, based on an estimated weighted average cost of capital; and

    (b)     the implied net present value of a corresponding terminal value of Aruba, calculated by multiplying the estimated net operating profit after taxes ("NOPAT") (assuming a cash tax rate of 25%) in fiscal year 2020, based on the Management Projections, by a range of multiples of fully-diluted enterprise value to next-twelve-months NOPAT of 11.0x to 16.0x, and discounted to present value using the same range of discount rates used in item (a) above;

- applying a dilution factor of 28% provided by Aruba's management to reflect the dilution to current stockholders, assuming no buybacks, over the projection period due to the effect of future equity compensation grants projected by Aruba's management; and

- 18 -

- dividing the resulting amount by the number of fully-diluted shares (assuming treasury stock method) of Aruba's common stock outstanding, adjusted for restricted stock units and market stock units and stock options outstanding, as provided by Aruba's management as of February 27, 2015.

Based on the calculations set forth above, this analysis implied a range of values for Company common stock of approximately $20.85 to $30.02 per share.

57. These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶55 for a variety of reasons. First, it is well established that: (i) the calculation of a discount rate requires the application of a number of objective inputs and assumptions; and (ii) the ultimate discount rate selected often has the single largest impact on a resulting discounted cash flow ("DCF") valuation. Accordingly, Aruba shareholders must be provided insight into the reasonableness of Qatalyst's discretionary use of the inputs and assumptions used to compute and/or select the discount rate range and dilution factor used in this analysis. This is particularly true where, as here, the discount rate range selected by Qatalyst is unusually large, thus driving a much wider value range than typical in a DCF analysis. Likewise, because DCF analyses are extremely sensitive to derivations in the inputs used (particularly those impacting projected cash flows), it is imperative that shareholders be provided with the information underlying the implied perpetuity growth rate range selected. The terminal value of a DCF analysis can be calculated either using a terminal multiple (as performed by Qatalyst) or a perpetuity growth rate and is often where much of the value in a DCF analysis resides. The implied perpetuity growth rate can be calculated as a "sanity" check when terminal multiples are used. This disclosure is therefore important because it would provide much needed clarity on whether the NOPAT multiples selected by Qatalyst fully reflect the value of Aruba. Without the aforementioned omitted information, Aruba shareholders cannot evaluate for themselves whether the analysis was performed properly and, in turn, determine what weight, if any, they should place on the analysis (and Qatalyst's fairness opinion as a whole) when deciding whether to vote to approve the Proposed Acquisition.

58. The description of Qatalyst's *Illustrative Selected Companies Analysis* on pages 50-51 of the Proxy is materially deficient because it fails to disclose:

- 19 -

1        (a)     the individually observed estimated price to earnings per share multiples for

2   calendar year 2015 for each of the selected public companies analyzed by Qatalyst; and

3        (b)     whether Qatalyst performed any type of benchmarking analysis for Aruba in

4   relation to the selected public companies.

5        59.     The omission of this information renders the following statements in the Proxy false

6   and/or materially misleading in contravention of the Exchange Act:

7        (a)     from pages 50-51 of the Proxy:

8   **Illustrative Selected Companies Analysis**

9   Qatalyst Partners compared selected financial information and public market
    multiples for Aruba with publicly available information and public market multiples
10  for companies selected by Qatalyst Partners. The companies used in this comparison
    included companies listed below and were selected because they are publicly traded
11  companies in Aruba's industry

12  *WLAN Vendors*

13  Ubiquiti Networks, Inc.
14  Ruckus Wireless Inc.
    Aerohive Networks, Inc.
15  Meru Networks Inc.

16  *Selected Pure Play Networking*

17  F5 Networks Inc.
18  Arista Networks, Inc.
    Radware Ltd.
19  A10 Networks, Inc.

20  *Selected Traditional Networking*

21  Cisco Systems, Inc.
22  Juniper Networks Inc.
    Brocade Communications Systems Inc.

23  Based upon research analyst consensus estimates for calendar year 2015, and using
24  the closing prices as of February 27, 2015 for shares of the selected companies,
    Qatalyst Partners calculated, among other things, the implied price to earnings per
25  share multiples for calendar year 2015, which we refer to as the "CY2015E P/E
    Multiples", for each group of the selected companies. The median CY2015E P/E
26  Multiples among the selected WLAN Vendor companies analyzed was 20.5x, among
27  the selected Pure Play Networking companies analyzed was 20.6x, and among the
    selected Traditional Networking companies analyzed was 13.4x. The CY2015E P/E

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
AND BREACH OF FIDUCIARY DUTIES

Multiple for Aruba was 14.9x based on the Analyst Projections using Aruba's closing share price on February 24, 2015.

Based on an analysis of the CY2015E P/E Multiples for the selected companies, Qatalyst Partners selected a representative range of 14.0x to 20.0x and applied this range to Aruba's estimated calendar year 2015 per share earnings based on each of the Management Projections and the Analyst Projections. This analysis implied a range of values for Company common stock of approximately $18.52 to $26.46 per share based on the Management Projections and approximately $17.23 to $24.61 per share based on the Analyst Projections.

No company included in the selected companies analysis is identical to Aruba. In evaluating the selected companies, Qatalyst Partners made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters. Many of these matters are beyond the control of Aruba, such as the impact of competition on the business of Aruba and the industry in general, industry growth and the absence of any material adverse change in the financial condition and prospects of Aruba or the industry or in the financial markets in general. Mathematical analysis, such as determining the arithmetic mean, median, or the high or low, is not in itself a meaningful method of using selected company data.

60.    These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶58 because such omissions are essential to shareholders' ability to properly evaluate the analysis performed by Qatalyst.  For example, without the individually observed multiples, shareholders are unable to determine for themselves whether the multiples applied to the financials for Aruba are representative of the selected comparable companies (or groups of selected comparable companies (i.e., WLAN Vendors, Pure Play Networking, and Traditional Networking companies)) that are most similar to the Company.  Moreover, a review of analyst research on Aruba results in much different comparable companies being selected by the analyst community, giving more weight to the importance of this disclosure.  Similarly, much like disclosing individual multiples for the selected companies provides greater visibility on the differences between companies and selected companies groups, disclosing benchmarking metrics provides clarity on operating and financial metrics by which Aruba can be benchmarked against the selected companies. Without the benchmarking metrics, it is difficult to determine the process Qatalyst used to select the valuation multiples in this analysis.  This is particularly important as Aruba is expected to enjoy strong revenue growth and even more explosive profit growth during the forecast period.  All things

- 21 -

being equal, higher growth should lead to higher valuation multiples.   Without the benefit of knowing whether Qatalyst performed a benchmarking analysis to account for differences between Aruba and the comparable entities it selected, the shareholders' ability to understand this analysis is significantly limited, rendering them unable to make a fully-informed decision whether to vote to approve the Proposed Acquisition.

### *Disclosure Deficiencies Concerning the Anticipated Future Performance of Aruba*

61.   According to the Proxy, Qatalyst was provided with, and relied significantly upon, certain financial forecasts prepared by Aruba management for fiscal years 2015-2020 in preparing its respective financial valuation analyses.   The Proxy does not, however, disclose certain aspects of the February Projections (as defined in the Proxy) that are material to Company shareholders' decision whether to approve the Proposed Acquisition, including the following line items for the relevant fiscal years:

      (a)     earnings before interest and taxes (or depreciation and amortization);

      (b)     changes in net working capital; and

      (c)     any other non-disclosed adjustments to unlevered free cash flows.

62.   The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

      (a)     from pages 54-56 of the Proxy:

**Management Projections**

Aruba does not, as a matter of course, publicly disclose projections as to its future financial performance. However, in connection with the comprehensive strategic and financial review process as described in this proxy statement, management prepared two sets of financial projections. In October 2014, management prepared projections for fiscal years 2015-2017, which were provided to representatives of Qatalyst Partners and the representatives of HP, which we refer to as the "October Projections". In February 2015, management updated and supplemented the October Projections to create (i) projections for the remainder of fiscal year 2015 and fiscal years 2016-2017, which we refer to as the "2015-2017 Projections", and (ii) based on its extrapolation of trends in the 2015-2017 Projections, projections for fiscal years 2018-2020, which we refer to as the "2018-2020 Projections", which, together with the projections described in clause (i), we refer to as the "February Projections". We refer collectively to the February Projections and the October Projections as the "Management Projections". The Management Projections were the only financial

forecasts with respect to Aruba provided by Aruba for use by its financial advisors in performing their financial analyses during the strategic and financial review process.

The Management Projections were not prepared with a view to public disclosure and are included in this proxy statement only because the October Projections were provided to the representatives of Qatalyst Partners and representatives of HP and the 2015-2017 Projections were provided to the Board of Directors and certain portions thereof were also made available to HP and its representatives in the strategic and financial review process in connection with its due diligence review of Aruba. The February Projections were made available to Qatalyst Partners and Evercore for use in connection with their respective provision of financial advisory services as described in this proxy statement. The Management Projections were not prepared with a view to compliance with (1) GAAP, (2) the published guidelines of the SEC regarding projections and forward-looking statements; or (3) the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. PricewaterhouseCoopers, our independent registered public accountant, has not examined, reviewed, compiled or otherwise applied procedures to the Management Projections and, accordingly, assumes no responsibility for, and expresses no opinion on, them. The Management Projections included in this proxy statement have been prepared by, and are the responsibility of, Aruba management.

Although a summary of the Management Projections is presented with numerical specificity, they reflect numerous assumptions and estimates as to future events made by Aruba management that they believed were reasonable at the time the Management Projections were prepared, taking into account the relevant information available to Aruba management at the time. However, this information is not fact and should not be relied upon as being necessarily indicative of actual future results. Important factors that may affect actual results and cause the Management Projections not to be achieved include general economic conditions, Aruba's ability to achieve forecasted sales, accuracy of certain accounting assumptions, changes in actual or projected cash flows, competitive pressures and changes in tax laws. In addition, the Management Projections do not take into account any circumstances or events occurring after the date that they were prepared and do not give effect to the Merger. As a result, there can be no assurance that the Management Projections will be realized, and actual results may be materially better or worse than those contained in the Management Projections. The Management Projections cover multiple years, and such information by its nature becomes less reliable with each successive year. The inclusion of the Management Projections in this proxy statement should not be regarded as an indication that the Board of Directors, Aruba, Qatalyst Partners, Evercore, HP or any of their respective affiliates or representatives or any other recipient of this information considered, or now considers, the Management Projections to be predictive of actual future results. The summary of the Management Projections is not included in this proxy statement in order to induce any stockholder to vote in favor of the proposal to adopt the Merger Agreement and the transactions contemplated thereby or any of the other proposals to be voted on at the Special Meeting. We do not intend to update or otherwise revise the Management Projections to reflect circumstances existing after the date when made or to reflect the occurrence

- 23 -

of future events, even in the event that any or all of the assumptions underlying the Management Projections are shown to be in error or no longer appropriate. **In light of the foregoing factors and the uncertainties inherent in the Management Projections, stockholders are cautioned not to place undue, if any, reliance on the projections included in this proxy statement**.

The Management Projections and the accompanying tables contain certain non-GAAP financial measures, including non-GAAP net income, non-GAAP operating income and non-GAAP gross profit, which Aruba believes are helpful in understanding its past financial performance and future results. The non-GAAP financial measures are not meant to be considered in isolation or as a substitute for comparable GAAP measures and should be read in conjunction with Aruba's consolidated financial statements prepared in accordance with GAAP and the reconciliation to GAAP measures presented herein. Aruba's management regularly uses Aruba's supplemental non-GAAP financial measures internally to understand and manage the business and forecast future periods.

The Management Projections are forward-looking statements. For information on factors that may cause Aruba's future results to materially vary, see the information under the section captioned "*Forward-Looking Statements*."

## Aruba — October Projections

(*$MM*)

| | Projections | | |
| --- | --- | --- | --- |
| | FY'2015 | FY'2016 | FY'2017 |
| Revenue | $ 834 | $ 1,096 | $ 1,267 |
| Non-GAAP Gross Profit | $ 650 | $ 794 | $ 995 |
| Non-GAAP Operating Income | $ 190 | $ 251 | $ 350 |

## Aruba — February Projections

(*$MM*)

| | Actual | Projections | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | FY'2014 | FY'2015 | FY'2016 | FY'2017 | FY'2018 | FY'2019 | FY'2020 |
| Revenue | $ 729 | $ 872 | $ 1,038 | $ 1,235 | $ 1,421 | $ 1,561 | $ 1,738 |
| Non-GAAP Gross Profit | $ 522 | $ 634 | $ 762 | $ 911 | $ 1,051 | $ 1,183 | $ 1,301 |
| Non-GAAP Operating Income | $ 128 | $ 169 | $ 245 | $ 307 | $ 355 | $ 400 | $ 448 |
| Non-GAAP Net Income | $ 91 | $ 137 | $ 171 | $ 215 | $ 249 | $ 280 | $ 308 |
| Unlevered Free Cash Flow | $ 113 | $ 186 | $ 249 | $ 261 | $ 283 | $ 317 | $ 346 |
| Capital Expenditures | $ 19 | $ 21 | $ 24 | $ 68 | $ 30 | $ 33 | $ 33 |

Set forth below is a reconciliation of non-GAAP net income, non-GAAP operating income and non-GAAP gross profit to the most comparable GAAP financial measures, based on financial information available to, or projected by, Aruba (totals may not add due to rounding):

- 24 -

### Aruba — February Projections

*($MM)*

| | Actual FY2014 | FY2015 | FY2016 | Projections FY2017 | FY2018 | FY2019 | FY2020 |
|---|---|---|---|---|---|---|---|
| **Non-GAAP Gross Profit:** | | | | | | | |
| Non-GAAP gross profit | $ 522 | $ 634 | $ 762 | $ 911 | $ 1,051 | $ 1,153 | $ 1,261 |
| Reconciling items: | | | | | | | |
| Stock-based compensation and related payroll taxes | 9 | 7 | 6 | 6 | 7 | 8 | 9 |
| Amortization expense of acquired intangible assets and other acquisition-related expenses | 9 | 7 | 4 | 2 | 1 | 1 | — |
| GAAP gross profit | $ 504 | $ 619 | $ 752 | $ 903 | $ 1,043 | $ 1,174 | $ 1,192 |
| **Non-GAAP Operating Income:** | | | | | | | |
| Non-GAAP operating income | $ 128 | $ 159 | $ 245 | $ 307 | $ 355 | $ 400 | $ 440 |
| Reconciling items: | | | | | | | |
| Stock-based compensation and related payroll taxes | 114 | 98 | 95 | 96 | 96 | 108 | 125 |
| Amortization expense of acquired intangible assets and other acquisition-related expenses | 14 | 2 | 2 | 1 | 1 | — | — |
| GAAP operating income (loss) | $ — | $ 60 | $ 156 | $ 210 | $ 258 | $ 292 | $ 315 |
| **Non-GAAP Net Income:** | | | | | | | |
| Non-GAAP net income | $ 91 | $ 137 | $ 171 | $ 215 | $ 249 | $ 290 | $ 308 |
| Reconciling items: | | | | | | | |
| Stock-based compensation and related payroll taxes | 114 | 98 | 95 | 96 | 96 | 108 | 125 |
| Amortization expense of acquired intangible assets and other acquisition-related expenses | 14 | 8 | 4 | 2 | 1 | 1 | — |
| Non-GAAP income tax effects | (8) | (14) | (3) | — | — | (4) | (2) |
| GAAP net income (loss) | $ (29) | $ 47 | $ 85 | $ 127 | $ 153 | $ 175 | $ 185 |

As set forth above, the reconciliation of non-GAAP operating income and non-GAAP gross profit from the October 2014 Projections were substantially similar to those for the February 2015 Projections.

As noted above, the plans and projections reflect numerous estimates and assumptions made with respect to industry performance, general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to our business, all of which are difficult to predict and many of which are beyond our control.

63.    These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶61 as this information is integral to shareholders' evaluation of the consideration being offered in the Proposed Acquisition.  Indeed, these financial projections provide a sneak peek into Aruba's expected future performance and, consequently, its value as a standalone entity.  More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought after disclosures by shareholders in the context of corporate transactions such as this.  Additionally, these projections form the backbone of the DCF analyses prepared by Qatalyst.  The information contained therein provides clarity on what is driving the changes in growth, margins, and unlevered free cash flow.  More detailed projections are necessary because they can be used to better understand the DCF analysis.  As it relates to Aruba's projections, there is a noticeable lag in the growth in cash flow versus the growth in revenue or operating profit.  Accordingly, some unseen aspects of the financial forecast being used by Qatalyst is driving down the Company's projections, and therefore, its value.  Without disclosing the source of this valuation drag, Aruba shareholders cannot fully understand the work performed by Qatalyst

or the value of their holdings. This is particularly important as the analyst community covering Aruba is notably against this deal, with most analysts providing strong language that the deal with HP significantly undervalues Aruba's shares. In sum, Aruba shareholders need this omitted information to make a fully-informed decision whether to vote to approve the Proposed Acquisition.

\* \* \*

64. Defendants' failure to provide Aruba shareholders with the foregoing material information constitutes a violation of sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the shareholder vote on the Proposed Acquisition, plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Acquisition and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

**DEFENDANTS' FIDUCIARY DUTIES**

65. In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with these duties, the directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors with preferential treatment at the expense of, or separate from, the public shareholders.

66.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Aruba, are obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

67.     Plaintiff alleges herein that defendants, separately and together, in connection with the Proposed Acquisition, violated and/or aided and abetted in the violation of fiduciary duties owed to plaintiff and the other public shareholders of Aruba, including the duties of loyalty, good faith, candor, due care, and independence. As a result of these breaches of fiduciary duties and the aiding and abetting therein, neither plaintiff nor the Class will receive adequate or fair value for their Aruba common stock in the Proposed Acquisition.

68.     Because defendants have breached their duties of due care, loyalty, and good faith in connection with the Proposed Acquisition, and/or have aided and abetted therein, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and SED Rule 14a-9 Promulgated Thereunder**

69.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

70.     During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 27 -

71.     The Proxy was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's assets.

72.     In so doing, the defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy.

73.     The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

74.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

75.     By reason of the foregoing, the defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

76.     Because of the false and misleading statements in the Proxy, plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

77.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of Aruba within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Aruba and participation in and/or awareness of the Company's operations and/or

- 28 -

intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contend are false and misleading.

79. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were thus directly involved in the making of this document.

81. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition. The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

82. By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

83. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Aruba's shareholders will be irreparably harmed.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
AND BREACH OF FIDUCIARY DUTIES

**COUNT III**

**Against All Defendants for Breach of Fiduciary Duties and Aiding and Abetting**

84.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

85.     The Individual Defendants, aided and abetted by Aruba, HP, and Merger Sub, have knowingly or recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the public shareholders of Aruba and have acted to put their personal interests ahead of the interests of Aruba's shareholders.

86.     By the acts, transactions, and course of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive plaintiff and the other members of the Class of the true value of their investment in Aruba.

87.     The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to Aruba's shareholders.  Aruba, HP, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the other holders of Aruba stock.

88.     As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly and in bad faith failed to exercise the care required, and breached their duties of loyalty, good faith, candor, and independence owed to the shareholders of Aruba because, among other reasons, they failed to ensure a fair process and maximization of shareholder value.

89.     Because the Individual Defendants dominate and control the business and corporate affairs of Aruba, and are in possession of private corporate information concerning Aruba's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Aruba which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

90.     By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have knowingly or recklessly and in bad faith failed to exercise ordinary care and

1  diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the

2  Class.

3      91.    As a result of the actions of defendants, plaintiff and the Class have been and will be

4  irreparably harmed.

5      92.    Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to

6  knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the other

7  members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition's

8  terms, and will not supply to Aruba's shareholders sufficient information to enable them to make

9  informed decisions regarding the tender of their shares in connection with the Proposed Acquisition,

10 and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the

11 Class.

12     93.    Plaintiff and the other members of the Class have no adequate remedy at law.  Only

13 through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected

14 from the immediate and irreparable injury which defendants' actions threaten to inflict.

15                              **PRAYER FOR RELIEF**

16     WHEREFORE, plaintiff demands injunctive relief, in plaintiff's favor and in favor of the

17 Class and against defendants, as follows:

18     A.    Declaring that this action is properly maintainable as a class action;

19     B.    Declaring and decreeing that the Proposed Acquisition was entered into in breach of

20 the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

21     C.    Enjoining defendants, their agents, counsel, employees and all persons acting in

22 concert with them from consummating the Proposed Acquisition, unless and until they comply with

23 their fiduciary duties under state law of loyalty, good faith, care, and candor to maximize

24 shareholder value and fully disclose all material information in their possession, and their duties

25 under sections 14(a) and 20(a) of the Exchange Act to provide shareholders with all material

26 information about the unfair sales process for the Company, the conflicts of interest suffered by

27 defendants in connection with the Proposed Acquisition, the unfair consideration offered in the

28 Proposed Acquisition, and the actual intrinsic value of the Company;

1        D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a

2 transaction that is in the best interests of Aruba's shareholders and to refrain from entering into any

3 transaction until the process for the sale or merger of the Company is completed and the highest

4 possible value is obtained;

5        E.     Rescinding, to the extent already implemented, the Merger Agreement or any of the

6 terms thereof;

7        F.     Awarding plaintiff the costs and disbursements of this action, including reasonable

8 attorneys' and experts' fees; and

9        G.     Granting such other and further equitable relief as this Court may deem just and

10 proper.

11 Dated: April 1, 2015

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
EDWARD B. GERARD
JUSTIN D. RIEGER


               /s/Stephen J. Oddo
               STEPHEN J. ODDO

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: 619) 525-3991
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com

DUNNAM DUNNAM HARMON WEST
   LINDLEY & RYAN LLP
HAMILTON P. LINDLEY
4125 W. Waco Drive
Waco, TX 76710
Telephone: (254) 753-6437
Facsimile: (254) 753-7434
hlindley@dunnamlaw.com

Attorneys for Plaintiff

1019868

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
AND BREACH OF FIDUCIARY DUTIES

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ANDREW NEWFIELD ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 02/25/15 | 5 | $21.8999 |
| | | |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |
| | | |

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

ARUBA

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **30** day of March , 3/30/2015.

_____
ANDREW NEWFIELD

- 2 -

ARUBA